## MALLORY *vs.* THE TIOGA RAIL ROAD COMPANY.

A rail road company, whose constant employment and business was the
transportation of property and passengers upon its rail road, for hire,
agreed with the plaintiff to furnish the motive power to draw his cars,
laden with his property, over its rail road; the plaintiff being bound to
load and unload the cars, and to furnish brakemen to accompany them on
the road, who were to be under the control of the defendant's conductor.
*Held* that the defendant assumed the liabilities of a *common carrier*, and was
liable as such for an injury to the cars of the plaintiff and his property
therein, not caused by inevitable accident or the public enemies.

THE defendant is a rail road corporation operating a rail
road from Blossburgh, in Pennsylvania, to Corning, New
York, a distance of forty miles. The plaintiff was a miner
of coal at Blossburgh, which he was in the habit of transport-
ing over the defendant's road, sometimes on the cars of the
defendant, but generally on those furnished by him, in which
case he also furnished brakemen, to go on the train, under
the control of the defendant's conductor, and the cars were
loaded and unloaded by the plaintiff. When the plaintiff
furnished his own cars, the defendant charged him, for freight,
one dollar per ton of coal; when the cars were furnished by
the defendant, the charge was one dollar and twenty cents
per ton. On the 21st day of June, 1854, the plaintiff's cars,
loaded with coal, while being transported from Blossburgh to
Corning, and about ten miles from the former place, in Penn-
sylvania, were thrown from the track, while passing a curve,
and fifteen of the cars were more or less broken in pieces, and
the contents spilled and partially lost. The action was
brought against the defendant as a common carrier; the
complaint alleging that the defendant received from him and,
undertook to carry from Blossburgh to Corning certain cars
laden with coal; which the defendant failed to transport.
On the occasion in question the plaintiff furnished his own
cars and brakemen, and loaded the cars, agreeing to pay a
freight of one dollar a ton to the defendant. On the trial
the plaintiff claimed that the defendant was a common car-

Mallory v. Tioga Rail Road Company.

rier, but was overruled by the court, on that point. He then gave evidence for the purpose of showing negligence on the part of the defendant, and offered to prove specific facts for that purpose. This evidence was objected to and excluded. The court nonsuited the plaintiff, and refused to submit to the jury the question of the defendant being a common carrier. Exceptions were taken by the plaintiff to the decision.

*Geo. T. Spencer*, for the plaintiff.

*H. M. Hyde*, for the defendant.

*By the Court*, JAMES C. SMITH, J. I have come to the conclusion that the defendants, in receiving from the plaintiff his cars loaded with coal, and undertaking to transport them over their rail road from Blossburgh to Corning, assumed the liabilities of common carriers.

That they were carriers, generally, cannot be questioned. Their constant employment being the transportation of property and passengers upon their rail road, for hire. It is claimed, however, by the defendants, that their undertaking with the plaintiff was special, and not within the scope of their general business, and that the law does not cast upon them the duty of common carries in respect to it, for two reasons: 1st. They undertook merely to furnish motive power to draw the plaintiff's cars, laden with his property, over their rail road, he to load and unload them; and 2dly, the plaintiff was to provide brakemen to accompany his cars on the route.

In support of their claim, the defendants cite the case of *Wells* v. *Steam Navigation Company*, (2 *Comst.* 207.) There, however, the defendants engaged to tow the plaintiff's boat on the Hudson river, which is a common highway; and the court held that the defendants were not carriers generally; that the property transported was not in their possession or under their control, and that they were not bailees

of any description.   This brief statement of the points on which that case turned, shows that it differs widely from the case in hand.

Yet, in order to allow the defendants all the aid which they can legitimately derive from that decision, I concede that notwithstanding the defendants in the case at bar were carriers generally, and were the proprietors of the route over which the goods were to be transported, in both which respects their case differs from that of the "Steam Navigation Company." Yet if, as is claimed by them, they simply entered into a special engagement outside of their general business, to provide the plaintiff with sufficient motive power to draw his cars over their road, under the care and control of his servants, they did not thereby assume the obligations of carriers.   But the case proved is, in my judgment, materially different from the one thus hypothetically stated.

In the first place, if I correctly apprehend the testimony, the undertaking of the defendants to carry the plaintiff's cars loaded with his coal, over their road, was strictly within the scope of the business which they as a corporation were permitted to carry on.   The act of the legislature of the state of Pennsylvania by which they were incorporated, and under which they constructed that part of their road lying in that state, authorized them to "charge and receive tolls, and for freight in and for the transportation of goods ❋  ❋ and for the conveyance of passengers," and among other rates prescibed one "on *empty cars*," and another "on all passengers, *excepting* only such as are *necessarily engaged in conducting the cars*."   It also directed that "no person ❋  ❋  shall *place any car* or other carriage" on the defendants' rail road "without a permit or license, first had and obtained from said company, subject to such rules and regulations as shall from time to time be established by the said company, to govern the use of said rail road."   And it provided "that all persons using the said road shall only use those cars, wagons and conveyances which shall be adapted thereto,

Mallory *v.* Tioga Rail Road Company.

which said cars, wagons and conveyances to be used thereon, for the transportation of persons or commodities, shall be prescribed by the said company." That part of the rail road lying in New York was operated by the defendants under an agreement with the Corning and Blossburgh company, a corporation created by the laws of the latter state, and by which such portion of the road was constructed and owned. By that agreement the defendants bound themselves to operate the entire road from Blossburgh to Corning, for the purpose of transporting passengers and property, specifying coal among other things, and for that purpose to furnish and keep in repair the necessary motive power, engines, machinery and cars, (but the agreement expressly provided that they should not be bound to furnish *coal cars.*) In 1854 the plaintiff was engaged in mining and marketing coal, and had large quantities of it carried over the defendants' road, some of it in defendants' cars, but principally in his own. When he furnished cars he also furnished brakemen, who were under the charge of the defendants' conductor, and he loaded and unloaded the cars, whether furnished by the defendants or himself. The price paid for freight per ton was one dollar and twenty cents if the defendants furnished cars, and one dollar when the plaintiff furnished them. On the 21st of June, 1854, the defendants undertook to transport over their road, from Blossburgh to Corning, forty-six cars loaded with coal belonging to the plaintiff. On their way fifteen of the cars were thrown from the track, and this action is brought to recover the damages thus occasioned. It is apparent from this statement not only that the carriage of loaded cars belonging to others over the defendants' road, for hire, was a part of the business expressly authorized by the act of their incorporation, and provided for by their agreement with the Corning and Blossburgh company, but that they had been engaged in thus transporting cars for the plaintiff during several months prior to their undertaking to carry the train in question.

But independently of the special provisions of the act of

incorporation and the agreement above referred to, I am of the opinion that the defendants' undertaking was in the line of their general business. It was certainly competent for them, as carriers, to undertake to transport the cars of the plaintiff, whether loaded or unloaded, upon trucks or platform cars belonging to themselves; and in such case they would clearly have been liable as carriers. The mere fact that the plaintiff's cars were run upon their own wheels, instead of being placed upon platform cars of the defendants, does not, in my judgment, take the case out of the scope of the defendants' business as carriers, or relieve them from liability as such. If the injury had occurred in consequence of a defect in the running gear of the plaintiff's cars, which the plaintiff ought to have guarded against, the case would have been materially different, for the reason that a carrier is not liable for a loss occasioned by the negligence or fraud of the owner. But I am unable to perceive, in the nature of the undertaking, any sound reason for holding that the defendants did not contract with the plaintiff as carriers.

In the next place, the plaintiff's cars, while being thus transported over the defendants' road, were not under the care and control of the plaintiff's servants. The entire train was controlled and managed by the employees of the defendants. The plaintiff merely furnished brakemen, whose duties, as the term implies, related exclusively to the running of the train, and not to the care or guarding of the plaintiff's property; and they were, in all respects, under the control of the defendants' conductor. They had no efficient means of protecting the property of their principal against the consequences of negligence or fraud, and the circumstance that they accompanied the train merely to assist in running it, does not, in any respect, absolve the defendants from their liability as carriers. If a servant of the owner happen to go with the goods, but there is no intention to let him meddle with the care of them, the carrier will be answerable for loss. (*Marsh. Ins. B.* 1, *ch.* 7, § 5; *Abbott on Ship., part* 3, *ch.*

Mallory *v.* Tioga Rail Road Company.

2, § 3. *Story on Bail.* § 533.) So, if a man travel in a stage coach, and take his portmanteau with him, though he has his eye upon the portmanteau, yet the carrier is not absolved from his responsibility, but will be liable if the portmanteau be lost. . (*Per Chambre, J. in Robinson* v. *Dunmore,* 2 *Bos. & Pull.* 418.) It was said by Bronson, J. in *Hollister* v. *Nowlen,* (19 *Wend.* 237,) that "when there is no fraud, the fact that the owner accompanies the property, cannot affect the principle on which the carrier is charged in case of loss." He likened the liability of a carrier to that of an innkeeper, and cited the remark in *Calye's case,* (8 *Co.* 63,) that "it is no excuse for the innkeeper to say that he delivered the guest the key of the chamber in which he lodged, and that he left the door open; but he ought to keep the goods and chattels of his guest there in safety."

The defendant's possession of the plaintiff's cars, while on the route, was none the less complete, by reason of the circumstance that they were loaded, and to be unloaded, by the plaintiff. In this respect the case is precisely like that of a stage coach proprietor carrying the trunk of his passenger.

I have now considered all the circumstances relied upon by the defendant to take this case out of the rule that the carrier is liable for loss, unless he shows that it was caused by inevitable accident or the public enemies. I fully appreciate the force of the suggestion that the rule is rigorous and sometimes severe, and that courts have, in various instances, refused to extend it to new cases; but, nevertheless, the rule is too well established to be questioned, and I regard this case as fully within its policy, which, as was said by Lord Mansfield, in *Forward* v. *Pittard,* (1 *T. R.* 27,) is "to prevent litigation, collusion, and the necessity of going into circumstances impossible to be unraveled."

If these views are correct, there should be a new trial.

New trial granted.

[MONROE GENERAL TERM, December 1, 1862. *Johnson, J. C. Smith* and *Welles,* Justices.]